

ORIGINAL

53
7/11/01

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TERRANCE MONTAGUE,
Plaintiff

v.

ROBERT W. MEYERS, et al.,
Defendants

No. 1:CV-00-0895

(Magistrate Judge Smyser)

FILED
HARRISBURG
JUL 10 2001
MARY E. D'ANDREA, CLERK
Per ______ DEPUTY CLERK

EXHIBITS IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

D. MICHAEL FISHER
Attorney General

By: GREGORY R. NEUHAUSER
Senior Deputy Attorney General

SUSAN J. FORNEY
Chief Deputy Attorney General
Chief, Litigation Section

OFFICE OF ATTORNEY GENERAL
15th Floor, Strawberry Square
Harrisburg, PA 17120
717-787-8106

DATE: July 10, 2001

# TABLE OF CONTENTS

Page

Complaint (5/18/00) .......... 1a

Answer (7/31/00) .......... 5a

Supplemental Pleading (2/27/01) .......... 8a

Answer to Supplemental Complaint (3/12/01) .......... 10a

Transcript of Deposition of Plaintiff (4/27/01) (excerpts) .......... 13a

Declaration of Robin L. Kerstetter (7/9/01) .......... 39a

Declaration of John M. Allar (7/9/01) .......... 42a

Certificate of Service

FORMAT TO BE USED BY A PRISONER IN FILING A CIVIL RIGHTS COMPLAINT

5-18-
(1)

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BZ-2761
(Inmate Number)

TERRANCE MONTAGUE
(Name of Plaintiff)

SCI-ROCKVIEW,
Box A, Bellefonte, PA 16823-0820
(Address of Plaintiff

vs.

ROBERT. W. MEYERS, ROBERT S. BITNER, DAVID J. WAKEFIELD, TERRY L. WHITMAN, JACK M. ALLAR, LARRY LIDGETT, LT. DECKER, MAJOR YANCEY. JEFFREY A. RACKOVAN

1:CV00-089
(Case Number)

COMPLAINT

FILED
SCRANTON
MAY 18 2000
PER RMP
DEPUTY CLERK

TO BE FILED UNDER: 42 U.S.C. §1983 - STATE OFFICIALS

I. Previous Lawsuits

A. If you have filed any other lawsuits in federal court while a prisoner please list the caption and case number including year, as well as the name of the judicial officer to whom it was assigned:

MONTAGUE VS. ENGLISH ET AL CASE NUMBER CA 99-158

II. Exhaustion of Administrative Remedies

A. Is there a grievance procedure available at you institution?
X Yes ___ No

B. Have you filed a grievance concerning the facts relating to this complaint? X Yes ___ No

If your answer is no, explain why not ____________________

C. Is the grievance process completed? X Yes ___ No

1a

III. Defendants

A. Defendant Robert W. Meyers employed as the Superintendant at SCI-Rockview, Box A, Bellefonte, PA 16823-0820

B. Defendant Robert S. Bitner employed as a member of the Central Office Review Committe (CORC) at SCI-Camp Hill, PA 17001-0598

C. Defendant David J. Wakefield employed as Deputy Superintendant at SCI-Rockview, Box A, Bellefonte, PA 16823-0820

D. Defendant Terry L. Whitman is employed as Deputy Superintendant at SCI-Rockview, Box A, Bellefonte, PA 16823-0820

E. Defendant Jack Allar is employed as Unit Manager at SCI-Rockview, Box A, Bellefonte, PA 16823-0820

F. Defendant Larry Lidett is employed as Health Care Administrator at SCI-Rockview, Box A, Bellefonte, PA 16823-0820

G. Defendant Lt. Decker is employed as Block Lieutenant at SCI-Rockview, Box A, Bellefonte, PA 16823-0820

H. Defendant Major Yancy is employed as Major of the guards at SCI-Rockview, Box A, Bellefonte, PA 16823-0820

I. Defendant Jeffert Rackovan is employed as Grievance Coordinator at SCI-Rockview, Box A, Bellefonte, PA 16823-0820

IV. Statement of Claim

(State here as briefly as possible the facts of your case. Describe how each defendant is involved, including dates and places. Do not give any legal arguments or cite any cases or statutes.)

1. The Department of Corrections (D.O.C.) has put out a Policy Statement, Policy Subject: Smoking in Department of Corrections Buildings and Facilities, Policy Number: 15.3.6, Date of issue: 5/20/94, Effective Date: 8/22/94.

2. SCI-Mahanoy put out a Policy Statement, Policy Subject Institutional Smoking Policy - SCI-Mahanoy, Policy Number: 15.3.6 Mah1, Date of issue: 8/1/94, Effective Date: 8/22/94, V. Policy "... When these preferences conflict, the preferences of the nonsmoker shall prevail. The right of an individual to protect his or her health shall take precedence over an individual's desire to smoke. Smoking shall be permitted/prohibited as specified herein....;" VI. Procedures " 3. ...inmate individually occupied cells/rooms or double cells/rooms as follows: a. Unit Managers or staff responsible for assignment of inmates to cells/rooms shall make a determination of the inmate's smoking and non-smoking preference prior to initiating the placement and upon arrival at the facility.; b. Every attempt shall be made to honor inmates' smoking preference. Inmates who are nonsmokers may be housed in a cell/room with another nonsmoking inmate. In the event the nonsmoking inmate requests to be assigned with a specific

 

inmate who is a smoker, his/her request may be honored provided there are no overriding security concerns. This request shall be documented in the DC-15, waiving his/her rights to cell/room with a nonsmoker: c. Nonsmoking inmates currently assigned to a cell/room with a smoking inmate may request to be reassigned to another cell/room. The Unit Manager or staff responsible for assignment will establish a waiting list for these moves. Actual cell/room reassignments shall be based on availability, appropriateness of cell/room mates, an inmate's health condition which may be aggravated by ETS and the inmate's position on the list.

3. That plaintiff does not smoke, had a respiratory disease (Asthmas) and uses an inhaler which he gets as part of his medical treatment here at SCI-Rockview.

4. On/before 12/27/99 plaintiff told and/or wrote to Larry Lidgett, Major Yancey, Mr. Kushwara, Lt. Solete, and Mr. Duck, that he did not smoke, had a respiratory disease (Asthmas) and uses an inhaler, that the inmate put in his cell was a smoker, and was causing him breathing problems, but no action was taken.

5. On 12/28/99 plaintiff filed an Official Inmate Grievance #ROC0768-99 to the Grievance Coordinator, Mr Jeffrey Rackovan, that he did not smoke, had a respiratory disease (Asthmas) and uses an inhaler, that the inmate put in his cell was a smoker, and was causing him breathing problems, Deputy Wakefield, Mr. Whitman, Major Yancy, and the Unit Manager, Mr. Duck, were sent a copy and/or make aware of these proceedings, plaintiff was moved from Building A and no other action was taken.

6. On/before 2/6/00, while residing on back on Building A in cell #518, plaintiff from the call-out found out that a inmate/smoker was scheduled to move into his cell, and told and/or wrote to Larry Lidgett, Lt. Decker, Major Yancey and the new Unit Manger of Building A, Mr. Allar, that he did not smoke, had a respiratory disease (Asthmas) and uses an inhaler, that the inmate put in his cell was a smoker, and was causing him breathing problems, but no action was taken.

7. On 2/7/00 this inmate/smoker was moved into plaitniff's cell.

8. On 2/7/00 plaintiff filed an Official Inmate Grievance #ROC-0073-00 to the Grievance Coordinator, Mr Jeffrey Rackovan, that he did not smoke, had a respiratory disease (Asthmas) and uses an inhaler, that the inmate put in his cell was a smoker, and was causing him breathing problems, Deputy Wakefield, Mr. Whitman, Mr. Allar, Mr. Zurybida were sent a copy and/or make aware of these proceedings, but no action was taken.

9. On 2/29/00 plaintiff moves to a cell with an inmate who does not smoke and will give up the bottom bunk after tiering search, where plaintiff is not only needs and/or has a "medical non-smokers status," but also has a medical "bottom bunk status".

10. On/about 2/29/00 plaintiff filed a Grievance Appeal to Superintendent, R. W. Meyers, that he did not smoke, had a respiratory disease (Asthmas) and uses an inhaler, that the inmate put in his cell was a smoker, and was causing him breathing problems, but no action was taken.




11. On 3/2/00 plaintiff filed a Grievance Appeal to the Central Office Review Committee (CORC), Robert S. Bitner, that he did not smoke, had a respiratory disease (Asthmas) and uses an inhaler, that the inmate put in his cell was a smoker, and was causing him breathing problems, but no action was taken.

V. RELIEF

(State briefly exactly what the court to do for you, Make no legal arguments. Cite no cases or statutes.)

1. Place an Injunction or Restraining Order against defendant and/or the Department of Corrections (D.O.C.) to prevent them from putting another smoker in plaintiff's cell.

2. Award plaintiff monetary damages of $1000.00 per day, from each defendant, for each day (2/5/00 - 2/29/00) defendants kept him in that cell with a smoker for mental and physical pain and suffering.

3. Award plaintiff a monetary sum of $10,000.00 to punish defendants. AND JURY DeMANded.

Signed this 8th dau of MAY, 1900.

Jerome Montague
(Signature of Plaintiff)

I declare under penalty of perjury that the foregoing is true and correct.

5\8\00
(Date)

Jerome Montague
(Signature of Plaintiff)

NEW FACTS

12. ON 4\27\00 I GOT OUT OF THE HOLE AND WAS PLACE ON-A BLOCK IN CELL 332 WI[TH] ANOTHER HEAVEY SMOKER AND AGAIN it is CAUSING ME BREATHING PROBLEMS WHERE I AM CONSTANTLY AT SICK-CALL, AND HAVE AGAIN FILED A GRIEVANCE.

Neuhauser

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TERRANCE MONTAGUE, Plaintiff

v.

ROBERT W. MEYERS, et al., Defendants

No. 1:CV-00-0895

(M.J. Smyser)

FILED
HARRISBURG, PA
JUL 31 2000
MARY E. D'ANDREA, CLERK
Per Deputy Clerk

## ANSWER

Defendants, by their attorneys, hereby submit this answer to the complaint.

## FIRST DEFENSE

The numbered allegations of the Statement of Claim section of the complaint are answered as follows:

1. ADMITTED.

2. ADMITTED.

3. DENIED.

4. ADMITTED in part; DENIED in part. ADMITTED that plaintiff wrote to the individuals listed. DENIED that no action was taken.

5. ADMITTED in part; DENIED in part. DENIED that no action was taken. The remainder of this numbered paragraph is ADMITTED.

6. DENIED.

7. ADMITTED.

8. ADMITTED in part; DENIED in part. DENIED that no action was taken. The remainder of this numbered paragraph is ADMITTED.



9. ADMITTED in part; DENIED in part. ADMITTED that plaintiff moved to a cell with an inmate who does not smoke. The remainder of this numbered paragraph is DENIED.

10. ADMITTED in part; DENIED in part. DENIED that no action was taken. The remainder of this numbered paragraph is ADMITTED.

11. ADMITTED in part; DENIED in part. DENIED that no action was taken. The remainder of this numbered paragraph is ADMITTED.

12. ADMITTED in part; DENIED in part. ADMITTED that on April 27, 2000 plaintiff was placed on A-Block, Cell 332 with an inmate of plaintiff's choosing. The remainder of this numbered paragraph is DENIED.

13. DENIED.

14. DENIED.

15. ADMITTED.

16. DENIED.

17. DENIED.

**SECOND DEFENSE**

The complaint fails to state a claim upon which relief may be granted.

**THIRD DEFENSE**

At no time have defendants, either individually or in concert with others, deprived or sought to deprive plaintiff of any rights, privileges or immunities secured to him by the Constitution or laws of the United States.

**FOURTH DEFENSE**

At all material times, defendants have acted with a reasonable good-faith belief in the lawfulness of their actions and are entitled to immunity therefor.

**FIFTH DEFENSE**

Plaintiff is entitled to no relief whether compensatory or equitable.

**WHEREFORE**, the complaint should be dismissed with prejudice.

**Respectfully submitted,**

**D. MICHAEL FISHER**
**Attorney General**

**By:** [signature]
**GREGORY R. NEUHAUSER**
**Senior Deputy Attorney General**

**SUSAN J. FORNEY**
**Chief Deputy Attorney General**
**Chief, Litigation Section**

**OFFICE OF ATTORNEY GENERAL**
**15th Floor, Strawberry Square**
**Harrisburg, PA 17120**
**717-787-8106**

**DATE: July 31, 2000**

7a

 

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TERRANCE MONTAGUE, Plaintiff | : | CIVIL NO. 1:CV-00-0895 |
| v. | : | (Magistrate Judge Smyser) |
| ROBERT W. MEYERS, et al Defendants | : | |

SUPPLEMENTAL PLEADINGS

Plaintiff Terrance Montague with leave of Court files the following Supplemental Pleadings.

DEFENDANTS

1. Defendant Martin Horn is the Commissioner for the Pennsylvania Department of Correction at 2520 Lisburn Road Camp Hill, PA 17001-0598

2. All defendants are sued in their individual and Official capacity.

FACTS

3. On 12/27/00, plaintiff was transferred to SCI-Waymart, a Mental Health Facility for a Mental Health Evaluation.

4. Plaintiff was transferred without his knowledge or consent.

5. At the time of Plaintiff's transfer, he was not under the care or treatment of any mental health personal.

6. At the time of plaintiff's transfer, he did not have a mental break down or any other type of mental episode.

7. At the time of plaintiff's transfer, he was in full control of his mental faculties.

8. While at SCI-Waymart plaintiff asked a staff member who was looking through plaintiff's record why was plaintiff at SCI-Waymart and was told that the staff member did not know, but that for some reason plaintiff was listed for a Mental Health Evaluation.

9. When plaintiff asked who had ordered said evaluation, he was told that it was ordered by Martin Horn.

10. Plaintiff transfer to SCI-Waymart was in retaliation for the filing of the instant action.

8a

11. Plaintiff's transfer to SCI-Waymart, a mental health faculty, cause plaintiff to anguish over why he was sent there, that defendants intended to keep him there, and that defendants intented to give him treatments that he did not want or need.

CLAIMS FOR RELIEF

12. Plaintiff is entitled to relief against defendants for transferring him to SCI-Waymart in retaliation for the filing of the instant action in violation of plaintiff's Due Process, a Six Amendment right.

13. Plaintiff is entitled to relief against defendants for causing him mental pain and suffering in violation of cruel and unusual punishment, an Eighth Amendment right.

14. Plaintiff seeks declaratory and monetary Judgment in the amount of $500.00 a day from each defendant for each day plaintiff was at SCI-Waymart.

Dated: 2-27-01

Terrance Montague

Terrance Montague, BZ-2761
Box A, Bellefonte, PA
16823-0820

4 [illegible] 3-12-01

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FILED HARRISBURG MAR 1 2 2001 MARY E. D'ANDREA, CLERK Per DEPUTY CLERK

| | | |
|---|---|---|
| TERRANCE MONTAGUE, Plaintiff | : | |
| | : | No. 1:CV-00-0895 |
| v. | : | |
| | : | (M.J. Smyser) |
| ROBERT W. MEYERS, et al., Defendants | : | |

**ANSWER TO SUPPLEMENTAL COMPLAINT**

Defendants, by their counsel, hereby answer plaintiff's supplemental complaint filed March 1, 2001.

**FIRST DEFENSE**

The numbered allegations of the supplemental complaint are answered as follows:

1. DENIED.

2. This numbered paragraph contains conclusions of law to which NO RESPONSE is required; to the extent they are deemed factual, they are DENIED.

3. ADMITTED in part; DENIED in part. ADMITTED that on December 27, 2000, plaintiff was transferred to SCI-Waymart for assessment of needs and treatment possibilities. DENIED that SCI-Waymart is a "mental health facility" inasmuch as that term is not defined.

4. ADMITTED in part; DENIED in part. ADMITTED that plaintiff was transferred without his consent. Defendants are WITHOUT KNOWLEDGE OR INFORMATION sufficient to form a belief as to the truth of the allegation that the transfer was without plaintiff's knowledge to be able to admit it; therefore, it is DENIED.

5. ADMITTED in part; DENIED in part. ADMITTED that at the time of plaintiff's transfer he was not actively seeking or participating in mental health treatment options.

DENIED that none was available to plaintiff. DENIED is the implication that none was

appropriate or warranted for plaintiff. DENIED also is the implication that a needs assessment

was inappropriate.

      6.     ADMITTED in part; DENIED in part. ADMITTED that at the time of plaintiff's

transfer he did not have a mental breakdown or other type of acute mental episode. DENIED is

the implication that a needs assessment was inappropriate.

      7.     DENIED.

      8.     Defendants are WITHOUT KNOWLEDGE OR INFORMATION sufficient to

form a belief as to the truth of this numbered allegation to be able to admit it; therefore, it is

DENIED.

      9.     Defendants are WITHOUT KNOWLEDGE OR INFORMATION sufficient to

form a belief as to the truth of this numbered allegation to be able to admit it; therefore, it is

DENIED.

      10.    DENIED.

      11.    DENIED.

      12.    This numbered paragraph contains conclusions of law to which NO RESPONSE

is required; to the extent they are deemed factual, they are DENIED.

      13.    This numbered paragraph contains conclusions of law to which NO RESPONSE

is required; to the extent they are deemed factual, they are DENIED.

      14.    This numbered paragraph contains conclusions of law to which NO RESPONSE

is required; to the extent they are deemed factual, they are DENIED.

The remainder of the supplemental complaint contains conclusions of law to which NO RESPONSE is required; to the extent they are deemed factual, they are DENIED.

**SECOND DEFENSE**

The complaint fails to state a claim upon which relief may be granted.

**THIRD DEFENSE**

At no time have defendants, either individually or in concert with others, deprived or sought to deprive plaintiff of any rights, privileges or immunities secured to him by the Constitution or laws of the United States.

**FOURTH DEFENSE**

At all material times, defendants have acted with a reasonable good-faith belief in the lawfulness of their actions and are entitled to immunity therefor.

**FIFTH DEFENSE**

Plaintiff is entitled to no relief whether compensatory or equitable.

**WHEREFORE**, judgment should be entered in favor of defendants.

**Respectfully submitted,**

**D. MICHAEL FISHER**
**Attorney General**

By: [signature]
**GREGORY R. NEUHAUSER**
**Senior Deputy Attorney General**

**SUSAN J. FORNEY**
**Chief Deputy Attorney General**
**Chief, Litigation Section**

**OFFICE OF ATTORNEY GENERAL**
**15th Floor, Strawberry Square**
**Harrisburg, PA 17120**
**717-787-8106**
**DATE: March 12, 2001**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TERRANCE MONTAGUE, PLAINTIFF : VS : NO. 1:CV-00-0895 ROBERT W. MEYERS, ET. AL., DEFENDANTS :

DEPOSITION OF: TERRANCE MONTAGUE

TAKEN BY: DEFENDANTS

BEFORE: LISA A. HANSELL, REPORTER NOTARY PUBLIC

DATE: APRIL 27, 2001, 9:45 A.M.

PLACE: SCI ROCKVIEW
ROUTE 26
BELLEFONTE, PENNSYLVANIA

APPEARANCES:

TERRANCE MONTAGUE, PRO SE
FOR - PLAINTIFF

OFFICE OF ATTORNEY GENERAL
BY: GREGORY R. NEUHAUSER, SENIOR DEPUTY ATTORNEY GENERAL
FOR - DEFENDANTS

TERRANCE MONTAGUE, called as a witness, being sworn, testified as follows:

DIRECT EXAMINATION

BY MR. NEUHAUSER:

Q Mr. Montague, we met before we went on the record, but let me, for the record, just reintroduce myself. I'm Mr. Neuhauser from the Attorney General's Office, and I represent the staff here at Rockview who you have filed suit against in Federal Court. Today at this deposition I would like to ask you some questions about your claims in that lawsuit and any other information that you might have about the incidents and the facts regarding that lawsuit. I'll also ask you some questions about your background and other information like that. If there is any question that you don't understand or you don't hear me ask it, just tell me, and I'll repeat it or rephrase it or try to change the question somehow so that you do understand it and hear me. Is that agreeable to you?

A Yes, sir.

Q You understand that?

A Yes, sir.

Q And you understand that you're under oath to tell the truth just as if we were in a court of law and the

Judge were there and you were sworn in to tell the truth?

A Yes, sir.

Q And I need to ask you if you're under any medication at the present time that would interfere with your ability to hear me or understand the question?

A No, sir.

Q How old are you, Mr. Montague?

A Twenty-eight.

Q And where are you from originally?

A Philadelphia.

Q Which part of Philadelphia?

A West Philly.

Q West Philly? How long have you been here at Rockview?

A I was here since '99.

Q When I looked at the records, it looked like you came in in or about May of 1999. Does that sound right to you?

A Yes, sir.

Q Where did you come from, what institution were you transferred from?

A Greensburg.

Q SCI Greensburg?

A Yes, sir.

Q And how long were you at Greensburg

approximately?

A I can't recall right offhand.

Q Do you remember when you first came into the State system?

A Yes.

Q What year was that?

A It was like in '92.

Q In which institution were you first incarcerated in in 1992?

A I went from Gratersford to Camp Hill. Then I went to the previous ones from there.

Q I'm just speaking of the State institutions now, not Philadelphia County or not any youth detention centers, just the State institutions.

A Yes. I went from Gratersford to Camp Hill, then from Camp Hill to Frackville and a few other ones from there.

Q And at some point you ended up at Greensburg; right?

A Yes.

Q But you're not exactly sure when?

A No, sir.

Q And what sentence are you serving?

A Right now, it's 4 to 15.

Q And what is that a conviction for?

A Aggravated assaults.

Q Ag assault?

A Aggravated assaults, possession of an instrument of a crime and maybe some other ones. I can't recall right offhand.

Q Do you know what your minimum date is or was?

A I think it was in '94, if I recall correctly.

Q And the maximum date?

A 2007.

Q Have you applied for parole since your minimum date expired?

A Yes, sir.

Q How many times?

A A few.

Q A few?

A Yes.

Q Was it every year since '94?

A No, because on some occasions the Parole Board gave me two year hits, some gave me nine, and some was eighteen.

Q Do you have a parole application pending at the present time?

A Yes. I see them in June as we speak.

Q You're scheduled to see the parole representative in June?

A Yes, sir.

Q The last time your parole was denied, do you recall what they told you you needed to do to improve your chances for parole, what they expected of you?

A Well, they stated to stay misconduct free, to get a jail recommendation, to make sure I was under prescribed medication. There was a few other stipulations, but I can't recall right now.

Q Okay. That's fine.

A If you would like, I can send you a copy of the green sheet because I do have it back in my cell in the RHU.

Q Did the Parole Board say anything to you about programs, getting involved in any programs that you needed to complete, like, for instance, drug and alcohol treatment or sex offender treatment or anything like that?

A The Parole Board didn't. My unit manager when I was down at Greensburg told me that they wanted me to go to stress and anger, and I was and ended that. Then I went on a few other programs of my own, you know, the NA, the AA, and some other ones that I volunteered for myself.

Q Okay. Have you completed the stress and anger program?

A I was in the process, but I went to the RHU so I never. . .

Q Okay. How about the drug and alcohol treatment, did you complete that program?

A No, sir.

Q You said you're in the RHU at the present time?

A Yes, sir.

Q What misconduct report did you receive?

A Well, I have a copy here if you would like to look at it.

Q That's okay. You can just tell me what you remember.

A An officer stated that I had threatened another officer about my legal mail.

Q How long have you been in the RHU at the present time?

A It's 45 or 46 days.

Q That's the sentence you got or that's how long you've been in?

A That's how long I've been in there. My sentence is 90 days.

Q So you're about halfway?

A Yes.

Q If you have to serve the whole 90?

A If I have to serve the whole 90 it will be a little longer, but I'm due to get out this week.

Q Okay. When you say due to get out, why do you assume that you're going to get out?

A Unlike other State Institutions, here at Rockview if you are in the RHU if you do half of your sentence and if you're doing good in there, then they let you out at halftime. But if you're in there cutting up or messing up, giving officers problems, they make you do the whole sentence.

Q So you're due to see the PRC this coming week?

A I seen them yesterday because they come around every Thursday in RHU, and they told me that I'm eligible to come out after Saturday, which would be like Monday or Tuesday.

Q But they didn't tell you whether you would actually come out?

A Yes, they did. They tell me I will be out sometime next week.

Q Okay. And then which cellblock or which housing unit will you go back to at that point after you come out of the RHU?

A Most likely, they're going to send me to B South.

Q And why is that?

A That's a nonsmoking block.

Q Why do you know that you're going to go to

B South?

A Well, because the unit manager for the nonsmoking block is part of PRC and --

Q Who is that?

A Mr. Kerstetter.

Q So tell me if I'm wrong, but what I think I'm hearing is that Mr. Kerstetter was on the PRC that you met with yesterday?

A Yes.

Q And he told you that when you get out of the RHU next week you're most likely going to go to B South, the nonsmoking block?

A Yes.

Q Is that right?

A Yes.

Q Do you have any information to dispute what Mr. Kerstetter told you, that you're going to go to the nonsmoking block?

A No, because previous to that -- they come around every Thursday and I talked to a man -- Dr. Gaertner had told me that Mr. Allar don't want me back on A Block.

Q He did not or he did?

A He did not want me back on A Block, and he said Mr. Allar felt it was time for me to change the block. That's when I talked to Mr. Kerstetter and asked him about

B South again.

Q And Mr. Kerstetter said you could go to B South?

A Yes. He had brought me a smoking agreement that they have for the nonsmoking block that I had to sign, and I signed it, and my counselor had it.

(Contract for Residence on Smoke Free Unit marked as Montague Exhibit 1.)

BY MR. NEUHAUSER:

Q Mr. Montague, I'm going to show you what we've marked as Deposition Exhibit 1 and ask you if that is the Contract for Residence on the Smoke Free Block that you just mentioned a minute ago that you signed?

A Yes, sir.

Q Is that your signature --

A Yes, that is.

Q -- at the bottom of the page --

A Yes, sir, it is.

Q -- where it says inmate's signature and date?

A Yes, sir.

Q So your testimony is that you were presented with this contract and you signed it as an agreement --

A Yes.

Q -- with the institution to go to the smoke free block?

A Yes.

Q Had you ever been presented one of these contracts before April of this year while you were here at Rockview?

A There was another time that I have been presented one, and I had went over there and talked to Mr. Kerstetter and Sergeant Rodriguez, who was the sergeant of the nonsmoking block, and I had talked to Mr. Kerstetter and Sergeant Rodriguez and I told them due to the fact of me being in a single cell by myself with no smoker in it, you know, I would like to stay where I'm at only due to the fact of I'm in a cell by myself and it wouldn't jeopardize me coming to B South and being in with a smoker because they still had smokers over there that's on the block.

I do have a few misconducts with me today from inmates that was on the nonsmoking block that signed an agreement that got caught with tobacco products and everything, and I told Mr. Kerstetter I didn't want to jeopardize my health no more than what it already is by having me come over there and being put in a cell with a smoker. I'm not no snitch, you know, and I'm not going to tell on no one that's smoking.

Q Let me see if I can back up a minute and understand what you just told me. You were on A Block at some point with Mr. Allar?

A Yes.

Q Before you went into the RHU; is that right?

A Yes.

Q And Mr. Allar or somebody on A Block presented you with one of these contracts to go to this nonsmoking block, but you decided not to do that because you had a single cell on A Block?

A Yes.

Q Is that right?

A I signed one in front of Mr. Allar and Lieutenant Nolt (phonetic), which is now the lieutenant of A Block, and I signed it.

Q But you decided not to go to B South?

A I only decided not to go to B South when the inmates over there were getting caught smoking in the cells, and I felt since medical had already given me a single cell until they could move me to the nonsmoking block I figured my health was already being jeopardized, why go over there and be put in a cell, in a doubled up cell, with an inmate that is sneaking a smoke when there ain't supposed to be no smoking on the block already. Now I'm on A Block and in a single cell, like the medical department recommended, I'm in less jeopardy -- I'm less jeopardized now than what I am on B South in a cell with a person that smokes.

Q Let me see if I understand. A Block is a

 24a

smoking block; right?

A Yes, but it ain't supposed to be.

Q But at the time you were there it was a smoking block?

A Yes.

Q And you had a single cell on A Block?

A Yes.

Q And you would rather have stayed there on A Block in the single cell than go over to B South, the nonsmoking block, and take the chance of being double celled with somebody who might be sneaking smokes. Is that what you're telling me?

A Exactly what I'm telling you is due to the fact that I'm happy in a cell by myself and no cell mate --

Q On A Block?

A Yes. At the time medical cleared me to have a single cell until the administration of Rockview moved me over to the nonsmoking block. They put me in a single cell.

Q But what I don't understand is when you say until you got clearance to go to B South. Well, when they gave you the contract to say now you can go to B South if you sign this, why wouldn't you do that?

A Before then you didn't need no contract. Before then you didn't need no contract to go to B South. If you didn't smoke, you were supposed to go over there.

plain nonsmokers.

Q Do you know that about all the inmates in B South or you just know some of them?

A Mr. Neuhauser, I could say that about a lot of the inmates in this jail because -- I'm not bragging when I say this, but I'm an inmate that everyone knows, and I have a reputation in this institution, and there's not nothing that I want to know that I can't find out.

Q Okay. Do you remember when it was that you were presented with one of these contracts to go to B South and you decided not to go?

A I can't exactly recall the exact date.

Q Okay. Let's see if we can pin it down. It, obviously, was after May of '99 when you got here; right?

A It was way after that.

Q Okay. And it would have been before you went into the RHU this past time, approximately 45 days ago; right?

A Yes.

Q It would have been in that period of time, between 99 and --

A It was a little after I came back from SCI Waymart.

Q If I recall, you went to Waymart in December of 2000?

A Yes.

Q Does that sound right to you?

A Yes.

Q Just this past December?

A Yes, December of 2000. I did not come back to Rockview until January 11th.

Q Okay. Of this year?

A Yes.

Q So it was shortly after January 11th --

A Yes.

Q -- that you're saying you were given this opportunity to go to B South and you chose not to?

A I didn't refuse to go.

Q Well, you decided it was better to stay on A Block for you?

A What I decided was that it was best for me to stay in a cell like the medical department had recommended where I'm not exposed to secondhand smoke to aggravate my asthma.

Q And that was on A Block?

A Yes. And I have documents here where it's stated that if they don't put me on the nonsmoking block to at least house me in a single cell, you know, and that's what they did.

Q Did you have a single cell before you went up

to Waymart on A Block or only after you came back?

A Well, I had been in a cell by myself due to the fact that my celly had moved out, and they had me in there ever since.

Q What I'm trying to find out is when that happened. Did you have a single cell before you went to Waymart or was it after you came back?

A Well, I was in the cell by myself before I went to Waymart for awhile because Mr. Allar and myself had talked and I asked him being that there was no other nonsmokers on this block, you know, let me stay in the cell by myself unless you find someone that come on this block that's a nonsmoker. I don't have no problem with having him come in the cell.

Q And Mr. Allar was able to do that, was able to give you a single cell?

A Well, he, himself, was able to give me a single cell, but he agreed to that. He didn't want to but --

Q Well, how long -- for how long of a period of time do you think you had a single cell before you went to Waymart?

A I can't recall right offhand.

Q That's okay. Was it just a few days, was it a couple of weeks?

that. So to give you really an exact I couldn't really say. All I can do is, if you want, is send you copies of all my commissary receipts that I have, and that could let you see from there.

Q Okay. But is it fair to say that you purchased cigarettes more than one time while you were on A Block? I mean, it wasn't just a one time thing, you would purchase them on --

A Not a constant basis.

Q Not a constant basis, but you did it more than one time?

A It was more than once. It was more than once, but it was only like maybe one or two packs that I would get for the individual that was making cards for my mom or my kids. You know, I wouldn't get them for no other reason. And a lot of times I would ask these individuals would they settle for food because I really didn't like to buy cigarettes due to the fact of me not smoking, but, you know, by these individuals smoking -- and this is how a lot of dudes survive in jail by hustling -- I had to get what they wanted, you know, in order to get what I wanted.

(Inmate's Request to Staff Member marked as Montague Exhibit 2.)

BY MR. NEUHAUSER:

Q Mr. Montague, I'm going to show you what we've

marked as Deposition Exhibit 2 and ask you if that's your handwriting?

A Yes. On 2/23 I did write that.

Q That's your signature there in the lower right-hand corner?

A And that's when I was in 102 because I was in there since I come back from Waymart and I was up near the door right --

Q On A Block?

A Yes. And right there I didn't have to worry about breathing in any tobacco smoke or anything because I was right there near the door and the door stayed open the majority of the time whereas though it helped me breathe a lot better.

Q Okay.

A And that's why when I went to Mr. Kerstetter I wrote this request slip here because at the time a lot of individuals was getting caught smoking in the cells whereas though they wasn't supposed to.

Q I understand that. You told me that before. I just wanted to ask you if this was your handwriting and this was the request to Mr. Kerstetter.

A Yes, sir.

Q Okay. Now, let me see if I read this right, and you tell me if I'm wrong.

30a

A Do you want me to read it to you?

Q Sure.

A Mr. Kerstetter, I would like to stay on A Block only because I'm in a single cell and don't have to worry about me getting a celly that smoke.

Q Okay.

A Thank you very much, Terrance Montague.

Q Are you pronouncing Montague?

A Yes.

Q I'm sorry. I've been calling you Mr. Montague. You should have told me. You should have told me you pronounce it Montague. Okay. Let me see if I understand your basic claim in this lawsuit, and you tell me if I'm wrong or you tell me where I am off base or I am not correct in the way I say it. Okay? You basically say that because of your asthma condition you should have been on a nonsmoking block the whole time you were here?

A Yes. From day one when this jail received me, when I first come in the door, I let them know I didn't smoke, I have a nonsmoking status along with a bottom bunk status. It was verified in my medical records, and I was showing Mr. Allar, along with other staff members here that was high up in rank that could do things about it, and they still failed to do anything about it.

Q Did any of those people explain to you why you

3/a

treated for asthma to keep your lungs clear. You know, they're not going to prescribe theophylline or inhalers to an individual that don't have asthma.

Q Had you always been on A Block here at Rockview before you went into the RHU?

A No, sir. When I first come, I was on D Block.

Q And who was the unit manager there?

A Mr. Morningstar.

Q Morningstar?

A Yes.

Q Did you complain to him about the smoke on D Block?

A Well, over there I was in a cell with a celly that didn't smoke, and by me being on 3 Back it was okay because there wasn't no smoking up there. You know, it wasn't like on A Block whereas though I'm down on the bottom tier exposed to it all. On D Block in the back, you know, there is not too much traffic back there like there is on A Block.

Q What tier were you on on D Block?

A I was on 3 Back.

Q That's the third tier?

A Yes, in the back.

Q How many tiers are there on D Block?

A Five. There is five on D Block, and there's

five tiers on A Block.

Q So when you were on D Block, you were on the third tier?

A In the back.

Q In the back?

A Yes.

Q When you were on A Block, you were on the first tier?

A Yes, and on 2 Front also. That was on A Block. I was on A Block on 2 Front, and then they put me on 3 Back, also with smokers. Then they put me on 1 Back on A Block also.

Q Okay. Other than D Block and A Block, were you on any other blocks here at Rockview?

A No, sir.

Q Before you went into the RHU?

A No, sir. D and A Block was the only two blocks.

Q How long were you on D, do you remember?

A I have my records here to verify. I can't recall right offhand.

Q All right. You came here in the spring of '99. Do you think you were on D Block for most of '99 or all of '99?

A That was -- I can't really say because I'd be

lying to you if I do that, and I don't want to do that.

Q I don't want you either to do that. I just want you to tell me what you can remember. Did you have to go to the RHU at any time between 1999 when you first got here and this present term in the RHU?

A On D Block -- yes, I went to the RHU a few times on D Block for numerous tickets.

Q Is there smoking in the RHU?

A Yes, at the time.

Q But you had a single cell in the RHU; right?

A No, sir.

Q You had a cell mate?

A Yes.

Q Did that cell mate smoke in the RHU?

A No, no. I didn't have no cellies in RHU that smoked. I would say fortunately.

Q Do you remember when you went to A Block the first time approximately?

A No. I can't even give you the date, but I do have records here that would help me.

Q Okay. And the two unit managers on A Block that you talked to while you were there about the smoking issue were Mr. Duck and Mr. Allar?

A Yes, sir.

Q Anybody else? I mean any other unit

know, that's the best I can get out of it. I'm the only one up there that they felt shouldn't be there. I'm talking and talking, and I'm helping other individuals with legal work and everything. They're asking me why are you here. I'm asking them why am I here.

Q How long were you at Waymart?

A Maybe like 2 weeks to 3 weeks, which Waymart is a 6 to 9 month program. You can't come out no less than 6 months, you know, and I was there -- they had been telling me, okay, well, don't cause no problems, we're going to hurry up and send you back, and they sent me back on 1/11/2001. I believe I left from Rockview, if I recall correctly, 12/27.

Q 2000?

A Yes.

Q If those dates are right -- and I'm not saying that you're wrong. But if those dates are right, then you would have been at Waymart about three weeks?

A Yes. I have documentations of it.

Q Does that sound about right to you, you were there three weeks?

A Yes, because I left around the 27th. I know it was right after Christmas.

Q When did you have this conversation with Secretary Horn where you told him that he was a liar?

# SCI ROCKVIEW
# CONTRACT FOR RESIDENCE ON SMOKE FREE UNIT

I, TERRANCE MONTAGUE BZ-2761 (Inmate Name & DOC #), currently residing on A (Block) at SCI Rockview request to live in the smoke free housing unit (BA) at SCI Rockview.

I agree to fully cooperate and adhere to the posted regulations/procedures, which include the following:

1. No smoking tobacco products will be allowed in any area of the unit, including cells.

2. Inmates residing on the smoke free unit will not be permitted to possess any smoking products on their person or in their cell. These items will be considered contraband.

3. Once assigned to the smoke free unit, the inmate will not voluntarily be transferred off the unit for at least six (6) months.

4. Violations of the above regulations will result in the issuing of misconducts, and removal from the unit.

5. Inmates removed from the smoke-free unit for violations will be returned to their pervious unit unless determined otherwise by the unit team.

6. Inmates housed on the smoke free unit agree that smoking tobacco will not be purchased from the institution commissary.

I further understand and agree that all department and institution policies and procedures will remain in effect on the smoke-free unit.

TERRANCE MONTAGUE BZ-2761
Inmate Name & Number (PRINT)

Terrance Montague 4-13-01
Inmate Signature & Date

Ahmad Abdul-Hakim
Counselor Name (PRINT)

Ahmad Abdul-Hakim 4-13-01
Counselor Signature & Date

EXHIBIT Montague 7

SUPT. ROCKVIEW Fax:814-355-6060 Apr 25 2001 10:39 P.02

RECEIVED FEB 23 2001 at Rockview Supt's Assistant's Office

DC-135A

INMATE'S REQUEST TO STAFF MEMBER

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS

INSTRUCTIONS

*Complete Items Number 1-7. If you follow instructions in preparing your request, it can be disposed of more promptly and intelligently.*

1. TO: (NAME AND TITLE OF OFFICER) KERSTETTER

2. DATE 2-23-01

3. BY: (INSTITUTIONAL NAME AND NUMBER) TERRANCE MONTAGUE #BZ-2761

4. COUNSELOR'S NAME

5. WORK ASSIGNMENT KITCHEN

6. QUARTERS ASSIGNMENT A-102

7. SUBJECT: STATE COMPLETELY BUT BRIEFLY THE PROBLEM ON WHICH YOU DESIRE ASSISTANCE. GIVE DETAILS.

MR. KERSTETTER,

I Would LIKE TO STAY ON A-BLOCK ONLY BECAUSE I AM IN A SINGLE CELL AND don't have TO worry About ME GETTING A [illegible] THAT SMOKE.

THANK YOU
VERY MUCH
Terrance Montague

8. DISPOSITION: (DO NOT WRITE IN THIS SPACE)

[illegible] 2/27/01

☐ TO DC-14 CAR ONLY ☐ TO DC-14 [illegible]

STAFF MEMBER

EXHIBIT [illegible]

370

# READING & SIGNING OF DEPOSITION

To be attached to the depostion of: Terrance Montague

taken on 4/27/2001 by reporter Lisa Hansell

in the matter of Terrance Montague vs. Robert W. Meyers, et. al.

| PAGE | LINE | CHANGE OR CORRECTION AND REASON |
|---|---|---|
| Page 12 | Line 10 | by me being in a cell by myself with no smoker. |
| Page 12 | Line 12 | by me being on A-Block or B-South my life is in danger |
| Page 12 | Line 19 | being on A-Block and on B-South which is suppose to be non-smoking block my health is bein[g] jeopard[ized] |
| Page 12 | Line 7 | I never had a single cell on A-Block I was just in there by myself |
| Page 12 | Line 16 | Medical had recommended that I be either moved to the non-smoking block or give me a single cell I didn't get any o[f] |
| Page 12 | Line 22 | I never was giving a single cell like medical recommended |
| Page 12 | Line 23 | my health is in jeopardy being on A-Block and on B-South my asthmas done got worse being on A-Blo[ck] And on B-South has long has they smoke in this jail my health is always going to be in jeopardy. |
| Page 14 | Line 7 | NO |
| Page 14 | Line 16 | Medical recommended I be put in a single cell or moved to B-South, but niether one of them happen |
| Page 14 | Line 18 | I never had a single cell when I was on A-Block |
| Page 15 | Line 9 | But by me being in a cell by myself, I never had a single cell why I was on A-Block |
| Page 15 | Line 12 | And now am on the non-smoking block my asthmas done got even worse. |
| Page 15 | Line 25 | here on B-South still are individuals that do smoke |
| Page 15 | Line 13 | They didn't do anything to make the non-smoking block better becouse you still have inmates and officer over here smoking when they ain't suppose to |
| Page 15 | Line 20 | Sergeant Rodriguez let inmates smoke on the non-smoking block only because Sergeant Rodriguez and th[e] unit manger of B-South told me about them putting a stop to inmates smoking. |
| Page 15 | Line 23 | Put in a cell with a smoker, my life is being jeopardized on B-South just has well has A-Bloc[k] |
| Page 16 | Line 22 | I would have to agree with you becouse inmates still smoke over here on B-South alone with so[me] of the officers. |
| Page 16 | Line 24 | Inmates who is on B-South now is inmates that smoke and inmates who don't really went to be o[n] here. |
| Page 17 | Line 4 | Mr. Neuhauser, I could only say that about some of the inmates. |
| Page 18 | Line 16 | I should of never been on A-Block with smoker's knowing I have asthmas and can't breath and eve[n] by me being in a cell by myself I still was exposed to secondhand smoke. |
| Page 18 | Line 18 | Am also going to be exposed to second hand smoke has long has am in this jail. |
| Page 18 | Line 24 | And they didn't even put me in a single cell they keep putting me in with smoker's |
| Page 19 | Line 16 | I never was giving a single cell |
| Page 19 | Line 18 | Mr. Allar didn't went me to have a single cell nor did he want me to move to B-South. |
| Page 19 | Line 21 | I never had a single cell I was just in a cell by myself only becouse my celly moved out |
| Page 21 | Line 19 | Any other time I go to the hole and come out Mr. Allar don't have any problem with me coming ba[ck] to the block then again he was only being nice to me because of the lawsuit I never had a |
| Page 26 | Line 13 | And by having the door open still didn't help me breath better |
| Page 26 | Line 10 | And by me being in 102 I was exposed to second hand smoke even more, plus the vents blow out dust which made it even harder for me to breath. |
| Page 27 | Line 4 | I never had a single cell, Mr. Allar had me think I had a single cell when I really never did. |

I have inspected and read my deposition as captioned above and have listed all changes and corrections above, along with my reasons therefore.

38

SIGNATURE: Terrance Montague

DATE: May 30th 2001

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TERRANCE MONTAGUE,** **Plaintiff** | : | |
| | : | **No. 1:CV-00-0895** |
| **v.** | : | |
| | : | **(Magistrate Judge Smyser)** |
| **ROBERT W. MEYERS, et al.,** **Defendants** | : | |

**DECLARATION OF ROBIN L. KERSTETTER**

Robin L. Kerstetter hereby declares under penalty of perjury in accordance with 28 U.S.C. §1746 that the following facts are true and correct to the best of his knowledge:

1. I am employed by the Pennsylvania Department of Corrections as the Unit Manager of B-block, a smoke-free block, at the State Correctional Institution at Rockview, and have held this position since the fall of 1999. I have been employed by the Department of Corrections for 25 years.

2. I am familiar with plaintiff and know him as a resident of B-block.

3. Plaintiff was transferred to B-block on April 30, 2001, and has resided on B-block since that time.

4. As long as plaintiff follows the non-smoking rules and regulations of B-block, a copy of which is attached hereto as Exhibit A, and any other general rule of inmate conduct, the administration of SCI-Rockview has no plans to transfer plaintiff from B-block.

ROBIN L. KERSTETTER

Executed on the 9th day of July, 2001 at Bellefonte, Pennsylvania.

# SCI ROCKVIEW
# CONTRACT FOR RESIDENCE ON SMOKE FREE UNIT

I, TERRANCE MONTAGUE BZ-2761, currently residing on A at SCI Rockview
(Inmate Name & DOC #) (Block)
request to live in the smoke free housing unit (BA) at SCI Rockview.

I agree to fully cooperate and adhere to the posted regulations/procedures, which include the following:

1. No smoking tobacco products will be allowed in any area of the unit, including cells.

2. Inmates residing on the smoke free unit will not be permitted to possess any smoking products on their person or in their cell. These items will be considered contraband.

3. Once assigned to the smoke free unit, the inmate will <u>not</u> voluntarily be transferred off the unit for at least six (6) months.

4. Violations of the above regulations will result in the issuing of misconducts, and removal from the unit.

5. Inmates removed from the smoke-free unit for violations will be returned to their pervious unit unless determined otherwise by the unit team.

6. Inmates housed on the smoke free unit agree that smoking tobacco will not be purchased from the institution commissary.

I further understand and agree that <u>all department and institution policies and procedures will remain in effect on the smoke-free unit.</u>

TERRANCE MONTAGUE BZ-2761
Inmate Name & Number (PRINT)

[signature] 4-13-01
Inmate Signature & Date

[signature]
Counselor Name (PRINT)

[signature] 4-13-01
Counselor Signature & Date

COMMONWEALTH'S
EXHIBIT
A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TERRANCE MONTAGUE,** | : | |
| **Plaintiff** | : | |
| | : | **No. 1:CV-00-0895** |
| **v.** | : | |
| | : | **(Magistrate Judge Smyser)** |
| **ROBERT W. MEYERS, et al.,** | : | |
| **Defendants** | : | |

**DECLARATION OF JOHN M. ALLAR**

John M. Allar hereby declares under penalty of perjury in accordance with 28 U.S.C.§1746 that the following facts are true and correct to the best of his personal knowledge.

1. I am employed by the Pennsylvania Department of Corrections as the Unit Manager of Building A at the State Correctional Institution at Rockview (SCI-Rockview) and have held this position since January 2000. I have been employed by the Department of Corrections since 1982.

2. The Unit Manager is a management position at the correctional institution. As such, he or she administers and manages the operation of a cellblock of inmates. In so doing, the Unit Manager coordinates the treatment and security services provided by staff for the inmates housed in the cellblock. Part of that coordination of services includes the assignments of inmates to cells on the block and the transfer of inmates form one cell to another within the cellblock.

3. SCI-Rockview maintains a documentary tracking system in order to be able to access information on inmate housing assignments. These documents are generated and maintained in the normal course of business of the institution, and are routinely used by me and other institution staff in furtherance of our duties and responsibilities. The primary source document is known as the Inmate Cell History.

4. I am familiar with plaintiff and know him from when he was a resident of A-block.

5. As the attached Inmate Cell History (Exhibit A) reveals, plaintiff was received at SCI-Rockview in May 1999. Between May 1999 and April 2001, plaintiff was housed in various locations, including A-block, the Restricted Housing Unit, the infirmary, the mental health unit and SCI-Waymart. This is revealed by the "Housing Status" column of Exhibit A.

6. With respect to the periods of time about which plaintiff complains in his complaint, Exhibit A hereto reveals that from 12/27/99 to 1/4/00, plaintiff was housed in cell 2017 on A-block. On 1/4/00, plaintiff was transferred to the R.H.U. From 2/3/00 to 2/29/00 plaintiff was housed in cell 5018 on A-block. On 2/29/00, plaintiff was moved to cell 5014, and then to cell 3018. From 4/26/00 to 5/3/00, plaintiff was housed in cell 3032 and then was moved to cell 1038.

7. Until plaintiff was transferred from A-block to B-block on April 30, 2001, the non-smoking block, every effort was made to house plaintiff with a non-smoker or a cellmate of his choice, within the constraints of trying to accommodate the housing need of over 400 inmates on the block.

8. While it is not apparent from available records whether plaintiff's cellmates during the relevant periods of time were smokers, I do recall that plaintiff requested changes in cellmates during February — April 2000 period of time and I attempted to accommodate plaintiff's requests.

9. At no time during this period was I advised by medical staff at SCI-Rockview that plaintiff had a medical restriction that mandated a non-smoking cellmate.

10. Plaintiff would have been transferred to B-block, the non-smoking block, before April 2001 had he agreed to cooperate with the regulations of the non-smoking block, which included the non-possession of tobacco products and an agreement not to request transfer off the block for six (6) months.

11. Until April 2001, plaintiff would not agree to the conditions to reside on a non-smoking block.

12. In February 2001, plaintiff sent the attached Request to Staff Member, Exhibit B hereto, to the Unit Manager of the non-smoking block which stated:

> Mr. Kerstetter: I would like to stay on A-block only because I'm in a single cell and don't have to worry about me getting a celly that smoke. [sic] Thank you very much. Terrance Montague

13. Plaintiff was in the Restricted Housing Unit ("RHU") from April 2 - April 30, 2001. On April 30, 2001 plaintiff was transferred to the non-smoking block because he had agreed to the regulations of the block.

John M. Allar

JOHN M. ALLAR

Executed on the 9 day of July, 2001 at Bellefonte, Pennsylvania.

SCI ROCKVIEW Fax:814-355-6052 Jun 29 '01 12:13 P.02

COMPUTER SERVICES
REMOTE PRINT TIME 9:38

INMATE BED ASSIGNMENT SYSTEM
INMATE CELL HISTORY
INMATE NUMBER: BZ2761

RUN: GR501RPT
DATE: 6/29/2001
PAGE: 1

INMATE NAME: MONTAGUE, TERRANCE

| LOC | BLDG | SECT | CELL DORM | BED NUM | HOUS STAT | SEC LVL | CUST LVL | DATE IN | DATE OUT |
|---|---|---|---|---|---|---|---|---|---|
| GRE | | | HOLD | | | | | 8/31/1998 | 5/19/1999 |
| 029 | B1 | 03 | BUS | | | | 4 | 5/19/1999 | 5/19/1999 |
| SMI | | | HOLD | | | | 4 | 5/19/1999 | 5/19/1999 |
| 016 | V1 | 10 | BUS | | | | 4 | 5/19/1999 | 5/19/1999 |
| ROC | | | HOLD | | | | 4 | 5/19/1999 | 7/12/1999 |
| ROC | D | A | 3031 | 1 | | 3 | 4 | 7/12/1999 | 7/22/1999 |
| ROC | D | A | 2022 | 2 | | 3 | 4 | 7/22/1999 | 11/29/1999 |
| ROC | D | A | 1039 | 1 | RHU | 3 | 5 | 11/29/1999 | 11/29/1999 |
| ROC | 3 | B | 1001 | 1 | INF | 5 | 3 | 11/29/1999 | 12/03/1999 |
| ROC | G | A | 1001 | 1 | RHU | 5 | 5 | 12/03/1999 | 12/06/1999 |
| ROC | G | B | 1022 | 1 | RHU | 5 | 5 | 12/06/1999 | 12/27/1999 |
| ROC | A | A | 2017 | 1 | | 3 | 3 | 12/27/1999 | 1/04/2000 |
| ROC | D | A | 1040 | 1 | RHU | 3 | 5 | 1/04/2000 | 1/05/2000 |
| ROC | G | B | 1024 | 1 | RHU | 5 | 5 | 1/05/2000 | 2/01/2000 |
| ROC | A | A | 2041 | 1 | | 3 | 4 | 2/01/2000 | 2/03/2000 |
| ROC | | | HOLD | | | | | 2/03/2000 | 2/03/2000 |
| ROC | A | A | 5018 | 2 | | 3 | 4 | 2/03/2000 | 2/17/2000 |
| ROC | A | A | 5018 | 1 | | 3 | 4 | 2/17/2000 | 2/29/2000 |
| ROC | A | A | 5014 | 1 | | 3 | 4 | 2/29/2000 | 2/29/2000 |
| ROC | A | A | 3018 | 1 | | 3 | 4 | 2/29/2000 | 4/04/2000 |
| ROC | D | A | 1046 | 1 | RHU | 3 | 5 | 4/04/2000 | 4/06/2000 |
| ROC | G | B | 1012 | 2 | RHU | 5 | 5 | 4/06/2000 | 4/18/2000 |
| ROC | | | HOLD | | | | | 4/18/2000 | 4/18/2000 |
| ROC | G | B | 1012 | 1 | RHU | 5 | 5 | 4/18/2000 | 4/26/2000 |
| ROC | A | A | 3032 | 1 | | 3 | 4 | 4/26/2000 | 5/03/2000 |
| ROC | A | A | 1038 | 1 | | 3 | 4 | 5/03/2000 | 5/04/2000 |
| ROC | A | A | 1032 | 1 | | 3 | 4 | 5/04/2000 | 5/23/2000 |
| ROC | | | HOLD | | | | | 5/23/2000 | 5/23/2000 |
| ROC | G | B | 1011 | 2 | RHU | 5 | 5 | 5/23/2000 | 6/13/2000 |
| ROC | | | HOLD | | | | | 6/13/2000 | 6/13/2000 |
| ROC | G | B | 1011 | 1 | RHU | 5 | 5 | 6/13/2000 | 6/28/2000 |
| ROC | A | A | 1037 | 1 | | 3 | 4 | 6/28/2000 | 10/05/2000 |
| ROC | D | A | 1039 | 1 | RHU | 3 | 5 | 10/05/2000 | 10/10/2000 |
| ROC | G | B | 1001 | 1 | RHU | 5 | 5 | 10/10/2000 | 11/03/2000 |
| ROC | A | A | 1042 | 1 | | 3 | 4 | 11/03/2000 | 12/26/2000 |
| ROC | 3 | C | 1012 | 1 | MHU | 3 | 4 | 12/26/2000 | 12/27/2000 |
| 016 | V1 | 04 | BUS | | | | 4 | 12/27/2000 | 12/27/2000 |
| SMI | | | HOLD | | | | 4 | 12/27/2000 | 12/27/2000 |
| 010 | V1 | 02 | BUS | | | | 4 | 12/27/2000 | 12/27/2000 |
| WAM | | | HOLD | | | | | 12/27/2000 | 12/27/2000 |
| WAM | C | 2 | 1005 | 1 | ICU | 2 | 4 | 12/27/2000 | 12/27/2000 |
| WAM | C | 2 | 1013 | 1 | ICU | 2 | 4 | 12/27/2000 | 1/11/2001 |
| WAM | C2 | 01 | BUS | | | | 4 | 1/11/2001 | 1/11/2001 |
| ROC | | | HOLD | | | | | 1/11/2001 | 1/11/2001 |
| ROC | A | A | 1002 | 1 | | 3 | 4 | 1/11/2001 | 2/23/2001 |
| ROC | A | A | 1019 | 1 | | 3 | 4 | 2/23/2001 | 3/15/2001 |
| ROC | D | AC | 1036 | 1 | RHU | 3 | 5 | 3/15/2001 | 3/15/2001 |
| ROC | G | B | 1010 | 2 | RHU | 5 | 5 | 3/15/2001 | 3/19/2001 |

COMMONWEALTH
EXHIBIT
A

COMPUTER SERVICES
REMOTE PRINT TIME 9:38

INMATE BED ASSIGNMENT SY[illegible]M
INMATE CELL HISTORY
INMATE NUMBER: BZ2761

RUN: GR501RPT
DATE: 6/29/2001
PAGE: 2

INMATE NAME: MONTAGUE, TERRANCE

| LOC | BLDG | SECT | CELL DORM | BED NUM | HOUS STAT | SEC LVL | CUST LVL | DATE IN | DATE OUT |
|---|---|---|---|---|---|---|---|---|---|
| ROC | | | HOLD | | | | | 3/19/2001 | 4/02/2001 |
| ROC | G | A | 1017 | 1 | RHU | 5 | 5 | 4/02/2001 | 4/30/2001 |
| ROC | B | A | 1041 | 1 | | 3 | 4 | 4/30/2001 | CURRENT |

Fax:814-355-6060 Apr 25 2001 10:39 P.02

SUPT. ROCKVIEW
RECEIVED
FEB 23 2001
at Rockview
Supt's Assistant's Office

DC-135A

INMATE'S REQUEST TO STAFF MEMBER

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS

INSTRUCTIONS

*Complete Items Number 1-7. If you follow instructions in preparing your request, it can be disposed of more promptly and intelligently.*

1. TO: (NAME AND TITLE OF OFFICER) KERSTETTER
2. DATE 2-23-01
3. BY: (INSTITUTIONAL NAME AND NUMBER) TERRANCE MONTAGUE #BZ-2761
4. COUNSELOR'S NAME
5. WORK ASSIGNMENT KITCHEN
6. QUARTERS ASSIGNMENT A-107
7. SUBJECT: STATE COMPLETELY BUT BRIEFLY THE PROBLEM ON WHICH YOU DESIRE ASSISTANCE. GIVE DETAILS.

Mr. KERSTETTER,

I would LIKE TO STAY ON A-BLOCK ONLY BECAUSE I am in A SINGLE CELL AND don't have To worry about me getting A celly THAT SMOKE.

THANK YOU
VERY MUCH
Terrance Montague

8. DISPOSITION: (DO NOT WRITE IN THIS SPACE)

[illegible] 2/27/01

☐ TO DC-14 CAR ONLY ☐ TO DC-[illegible]

STAFF MEMBER

COMMONWEALTH'S EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FORTHE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TERRANCE MONTAGUE,** | : | |
| **Plaintiff** | : | |
| | : | **No. 1:CV-00-0895** |
| **v.** | : | |
| | : | **(Magistrate Judge Smyser)** |
| **ROBERT W. MEYERS, et al.,** | : | |
| **Defendants** | : | |

## CERTIFICATE OF SERVICE

I, **GREGORY R. NEUHAUSER,** Senior Deputy Attorney General for the Commonwealth of Pennsylvania, Office of Attorney General, hereby certify that on **July 10, 2001**, I caused to be served a true and correct copy of the foregoing document **Exhibits in Support of Defendants' Motion for Summary Judgment** by depositing it in the United States mail, first-class postage prepaid to the following:

Terrance Montague, BZ-2761
SCI-Rockview
Box A
Bellefonte, PA 16823-0820

**GREGORY R. NEUHAUSER**
**Senior Deputy Attorney General**